**E-FILED**
Monday, 31 March, 2008  10:01:51 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| KACEY M. DONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:06-cv-1298 |
| v. | ) | |
| | ) | |
| JOANNE B. BARNHART, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

Before the Court are Plaintiff's Motion for Summary Judgment [Doc. 12], accompanying Memorandum [Doc. 13], and reply brief [Doc. 17], and Defendant's Motion for Summary Affirmance [Doc. 15] and accompanying Memorandum [Doc. 16].  For the reasons set forth below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

**I.
BACKGROUND**

Plaintiff filed her claim for Period of Disability ("PD") and Disability Insurance Benefits ("DIB") on October 2, 2002 when she was 22 years old. (R. at 17.) Plaintiff alleges she is entitled to PD and DIB due to her various mental disorders including, depression, anxiety, attention deficit disorder ("ADD"), personality disorder, oppositional defiant disorder, and other mental disorders. (R. at 19.)

Plaintiff's applications were denied both at the initial and reconsideration stages of review. (R. at 33-34.) Plaintiff then asked for reconsideration by an Administrative Law Judge

("ALJ"). (R. at 48-51, 52-54.) A hearing was held on March 22, 2005 in front of ALJ Barbara J. Welsch (R. at 17) and Plaintiff's claim was denied by the ALJ on March 2, 2006. (R. at 14-31). Plaintiff requested review of this decision, the Appeals Council denied review, and the ALJ's decision thus became the final decision of the Commissioner. (R. at 6-9.)

The record before the Court demonstrates that Plaintiff had mental difficulties leading to the alleged disability. There is no evidence of permanent physical impairments, except an evaluation by a Dr. French, Ph.D., a consulting psychologist, who assessed limitations on Plaintiff's ability to sit, stand and walk in November of 2000. (R. at 348-53.) With regard to Plaintiff's mental impairments, Plaintiff complained of problems with depression, crying, and getting out of bed in February of 1999. (R. at 227-81.) Dr. Delost prescribed Zoloft, but the medication was suspended in July of 1999 when Plaintiff became pregnant. (R. at 227-81.) Plaintiff continued on Zoloft after her miscarriage in August of 1999. (R. at 227-81.) Plaintiff discontinued medication again when she was pregnant in January of 2001. (R. at 227-81.) At this time, Plaintiff reported that Zoloft was not helping, and she was having mood-swings and outbursts. (R. at 227-81.) Plaintiff also reported that she was depressed without any anti-depressant medication, so she continued taking Prozac. (R. at 227-81.)

When Plaintiff was assessed by Dr. French in November of 2000, Plaintiff was diagnosed with depression and ADHD after one session. (R. at 357-62, 365-71, 372-87.) Plaintiff did not see Dr. French again until December of 2003. (R. at 357-62, 365-71, 372-87.) In 2005, Dr. French saw Plaintiff once in February and once in March. (R. at 357-62, 365-71, 372-87.) In February, Dr. French noted increased anxiety, and then in March, he reported that Plaintiff's anxiety had decreased and depression had stabilized, apparently in response to medication. (R. at

2

357-62, 365-71, 372-87.) Based on his evaluations, Dr. French determined that Plaintiff would not be able to meet the competitive demands of work. (R. at 357-62, 365-71, 372-87.)

Plaintiff was treated by a Dr. House, Ph.D., in August of 2001. (R. at 282-85.) Dr. House noted that Plaintiff had driven to the examination, her gait was unremarkable, her posture was erect and relaxed, and she was alert and fully oriented. (R. at 282-85.) Dr. House noted that Plaintiff was having panic attacks two or three times a week. (R. at 282-85.) Plaintiff stated that her symptoms were almost to a breakdown level, and she was having problems with concentration which affected her ability to work. (R. at 282-85.) Dr. House noted that Plaintiff had a blunted effect and appeared to be dull. (R. at 282-85.) Dr. House administered the Adult Behavioral Rating Scale in which Plaintiff responded positively to questions that indicated symptoms of inattention, impulsivity, and oppositional defiant disorder. (R. at 282-85.) Dr. House then prescribed Concerta for Plaintiff. (R. at 282-85.) Also in August of 2001, State Agency psychological consultants, Dr. Beers, Ph.D., and Dr. Hudspeth, Psy.D., examined Plaintiff's record and determined that Plaintiff had borderline intellectual functioning with mild limitations in daily activities, no limitations in social activities, moderate limitations in concentration and attention, and no episodes of deterioration or decompensation. (R. at 293-306.)

In October of 2002, Plaintiff reported anxiety, sleep problems, and depression to a Dr. Slater, her treating physician. (R. at 331-47.) According to Dr. Slater, Plaintiff's 15-month-old child was keeping her active. (R. at 331-47.) Plaintiff reported that she was doing very well on Adderol and Prozac. (R. at 331-47.)

Plaintiff was treated by a Dr. Lanier, Ph.D., in January of 2003. (R. at 310-12.) Plaintiff reported that she could perform all activities necessary for daily living, including driving a car.

(R. at 310-12.) She indicated that she was having trouble staying on task and was slower mentally than what her job required. (R. at 310-12.) Plaintiff stated that she was mildly depressed and she was having trouble holding down a job. (R. at 310-12.) Dr. Lanier observed symptoms of a blunted effect and noted that Plaintiff appeared dull. (R. at 310-12.) Plaintiff was given an IQ test and received a full-scale IQ score of 65, a verbal score of 72, and a performance score of 65. (R. at 310-12.) In addition, Plaintiff had a global assessment functioning score of 55. (R. at 310-12.) Dr. Lanier noted that Plaintiff could read, solve basic math problems, had an adequate attention span, and that the I.Q. score may be an underestimate because Plaintiff "gave up easily." (R. at 310-12.) Dr. Lanier further noted that Plaintiff had surprising strength in math, could read very well, and her IQ scores were below her educational, adaptive, and occupational functioning level. (R. at 310-12.) Dr. Lanier diagnosed Plaintiff with attention deficit disorder ("ADD") and borderline intelligence. (R. at 310-12.) Finally, in February 2005, Plaintiff reported problems with panic attacks to Dr. Slater. (R. at 331-47.)

Plaintiff testified at the March 22, 2002 administrative hearing before the ALJ that she has two children, ages four and 17 months, and lives with her husband. (R. at 423.) Plaintiff testified she attended school to the 10th grade and later received her General Education Degree ("GED"). (R. at 423.) Additionally, Plaintiff went through training to become a Certified Nurse's Aide ("CNA"). (R. at 423.) Plaintiff testified she could read and write, and the last time she worked was in 2002 as a CNA. (R. at 423.)

When the ALJ inquired into what current problems prevent Plaintiff from working, Plaintiff answered by stating that she has severe anxiety, ADD, and severe manic depression. (R. at 425.) Plaintiff testified that she has problems staying on task and finishing projects. (R. at 425.) Plaintiff described her daily routine and testified that her sister arrives at 6:30 a.m., her

husband leaves work at 7:30 a.m., and her sister stays until her husband comes home. (R. at 425.) Plaintiff further testified that her sister had been coming over for the previous three months since her "anxiety got real bad." (R. at 433.) Plaintiff stated that during the day she tries to get things done around the house, such as vacuuming, dusting and laundry, but she has problems finishing those tasks. (R. at 426.) Plaintiff went on to say that her mother comes over on the weekends to help around the house and get her caught up with the laundry. (R. at 433.)

Plaintiff testified that she fixes dinner at night, but her sister fixes meals for her children during the day. (R. at 426.) Plaintiff said she gets help from her husband when she goes to the grocery store. (R. at 426.) Plaintiff went on to testify that she watches TV, reads the newspaper, drives, keeps up with her hygiene, and has a flowerbed that she maintains. (R. at 427-29.) She also stated that she has a computer, uses the Internet and email, and sells things on Ebay. (R. at 431.)

Plaintiff further testified in response to the ALJ's questions that her medications are helping her "a little bit." (R. at 429.) Plaintiff stated she has side-effects from her medications, including fatigue, sleep problems, and stomachaches. (R. at 429.) Plaintiff testified that she sees Dr. French for her mental impairments once or twice a year, but lately she has seen him more often due to her problems. (R. at 430.)

When questioned by her own attorney, Plaintiff testified that after her last employment in 2002, both her mother and mother-in-law initially helped out with the children. (R. at 435-36.) Plaintiff stated that every day she gets dressed, fixes dinner, and takes her medication when reminded by her husband. (R. at 436-37.)  However, she does not do anything else on a daily basis. (R. at 436-37.) Plaintiff further testified that her husband leaves notes to remind her to pay bills and call the doctor. (R. at 437.) When asked about her previous work history, Plaintiff

blamed her terminations on her periodic anxiety attacks. (R. at 438-39.) Plaintiff clarified her
prior testimony by stating that she usually only watches sitcoms and just glances through the
newspaper without really reading the articles. (R. at 446.) She also stated that she has problems
remembering not to leave things on top of the stove. (R. at 446-47.)

Next, the Vocational Expert ("VE") testified at the hearing and described what jobs in
Plaintiff's past work history and in the national economy Plaintiff could perform. The ALJ
presented a hypothetical to the VE that included Plaintiff's education and past relevant work
experience, no exertional limitations, no jobs that included climbing or unprotected heights, and
jobs that would be limited to routine and repetitive, simple tasks. (R. at 457.) The VE opined that
Plaintiff could perform here past relevant work as a housekeeper, packager, and cook helper. (R.
at 457.) Next, the ALJ asked the VE to list other unskilled, entry-level jobs in the national
economy that someone with the Plaintiff's vocational profile could perform. (R. at 457.) The VE
testified that there were a vast amount of jobs matching Plaintiff's vocational profile in the
national economy and provided specific data, such as the job title, number of jobs, and skill level
for each job title. (R. at 457-59.) Finally, the VE confirmed that his testimony was consistent
with the Dictionary of Occupational Titles. (R. at 459.)

Last, Plaintiff's husband, Aladin Donnell, testified at the administrative hearing. Mr.
Donnell testified that he has been living with Plaintiff during the relevant time period. (R. at
474.) Mr. Donnell stated that on several occasions he had to come home from work to take care
of Plaintiff during her anxiety attacks. (R. at 474.) Mr. Donnell said that while he could
sometimes calm her down over the phone, these trips home happened at least twice a month. (R.
at 475.) In addition, he testified that Plaintiff's anxiety attacks had become worse over the
months leading up to the hearing. (R. at 475.) Mr. Donnell also stated that Plaintiff has trouble

completing household tasks, needs reminders from him in order for her to remember things, and receives daily help from family members. (R. at 478.)

## II.
## LEGAL STANDARD

In order to be entitled to disability benefits under the Social Security Act, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. §§ 494.1566, 416.966 (1986).

The establishment of disability under the Social Security Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42. U.S.C. § 1382(c)(a)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step sequential test is examined by the ALJ in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or equal one on the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation? (20 C.F.R. § 1560); and (5) is the plaintiff unable to perform any other work within the national economy? (20 C.F.R. § 1560).

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  <u>Garfield v. Schwerkis</u>, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burden of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the commissioner to show an ability to engage in some other type of substantial gainful employment.  <u>Tom v. Heckler</u>, 779 F.2d 1250 (7th Cir. 1985); <u>Halvorsen v. Heckler</u>, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence.  The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). An ALJ's credibility determination is given special deference and will not be reversed unless it is patently wrong. <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000); <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990); <u>Kelley v. Sullivan</u>, 890 F.2d 961, 965 (7th Cir. 1989).

### III.
### THE ALJ'S DECISION

The ALJ issued an opinion on March 2nd, 2006 in which she found that Plaintiff was not disabled for purposes of Sections 216(i) and 223 of the Social Security Act. (R. at 31.) In making this decision, the ALJ proceeded along the five step test described above. At step one, the ALJ

recognized that there is no evidence that Plaintiff engaged in any substantial gainful activity at any time since Plaintiff was employed as a CNA in 2002. (R. at 18.) At step two, the ALJ found Plaintiff to have severe mental impairments, but concluded there was no evidence that Plaintiff had severe physical impairments. (R. at 18.)

Proceeding to step three, the ALJ considered whether Plaintiff's combined impairments met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ considered all of Plaintiff's mental impairments, their combined effect under all listings, and concluded that Plaintiff did not demonstrate that she has the level of limitation required to meet a listing. (R. at 18.)

At step four, the ALJ determined that Plaintiff could do her past relevant work as a housekeeper. (R. at 29.) The ALJ further stated that Plaintiff could also perform her past jobs as a hand packager and cook helper. While the ALJ expressed some doubt about whether Plaintiff could perform these jobs at a significant enough level to constitute a substantial gainful activity, the ALJ still determined that Plaintiff could perform some of her past relevant work. (R. at 29.)

Although the ALJ found that Plaintiff failed to prove she was disabled at step four and the inquiry could have ended there, the ALJ continued her analysis. (R. at 29.) At step five, the ALJ relied primarily on the testimony of the VE, who concluded that there were a wide variety of unskilled entry-level jobs in the national economy which Plaintiff could perform. (R. at 29.) The ALJ concluded that the Social Security Administration ("SSA") met its burden at step five and ultimately held that Plaintiff was not entitled to benefits.

## IV.
## DISCUSSION

Plaintiff makes four arguments for why the ALJ's decision in this case should be overturned: (1) the ALJ erred at step three to properly consider if Plaintiff's combined

9

impairments met or equaled an impairment on the list of specified impairments provided in the

relevant regulations [Doc. 13 at 15; Doc 17 at 4]; (2) the ALJ improperly weighed the evidence

and incorrectly determined Plaintiff's Residual Functional Capacity ("RFC") [Doc. 13 at 10;

Doc. 17 at 1]; (3) the ALJ's erred in finding that Plaintiff was not credible [Doc. 13 at 16; Doc.

17 at 6]; and (4) the step four and five evaluations of the Plaintiff's work ability were improper.

[Doc. 13 at 22; Doc. 17 at 10.]

### 1. Meeting or Equaling a Listing.

At step three of the five-part test, the ALJ determines whether a plaintiff meets or

equals an impairment "listing" in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20

C.F.R. § 404.1520(d). Plaintiff argues that the ALJ interpreted Dr. Lanier's opinion

incorrectly and failed to evaluate the proper evidence when she found that Plaintiff did

not meet a listing under 12.05(C).  Specifically, Plaintiff argues that the ALJ should have

held that Plaintiff is mentally retarded under the appropriate regulations because of her

low score on the relevant IQ test. [Doc. 13 at 15.]

The regulations that govern the SSA lay out the basis for determining if a party is

mentally retarded:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>
> A.  Mental incapacity evidenced by dependence upon others for personal needs
> (e.g., toileting, eating, dressing, or bathing) and inability to follow directions,
> such that the use of standardized measures of intellectual functioning is
> precluded; Or
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less; Or

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace; or

    4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05

A plaintiff must not only demonstrate that she has met one of the requirements in paragraphs A-D, but must also meet the general definition of mental retardation.  Specifically, the regulations state that "[i]f your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (emphasis added).

Likewise, our Appellate Court has noted that "[t]he key term in the introductory paragraph of section 12.05 of the regulation... is 'deficits in adaptive functioning.'" Novy v. Astrus, 497 F.3d 708, 710 (7th Cir. 2007). Specifically, "[t]he term denotes [an] inability to cope with the challenges of ordinary life."  Id.  Accordingly, Plaintiff must show not only that she has an IQ score of below 70, but also that she suffers from deficits in adaptive functioning that are demonstrated by an inability to cope with the challenges of ordinary life.

In the case at bar, the ALJ acknowledged that Plaintiff suffers from severe mental impairments, but the combination of all of Plaintiff's impairments do not rise to the level of any mental listing. (R. at 18, 30.)  Specifically, while several of Plaintiff's doctors noted her

borderline intellectual functioning, no doctor concluded that Plaintiff demonstrated an inability to cope with the challenges of ordinary life. Plaintiff received treatment from Dr. House in 2001 and Dr. House made no mention of cognitive problems, except to note that Plaintiff had a blunted effect. (R. at 23, 282-85.) Dr. Lanier observed in 2003 that Plaintiff had a blunted effect and appeared to be dull but did not have any symptoms of cognitive problems. (R. at 24, 310-12.) Dr. Lanier diagnosed Plaintiff with attention deficit disorder and borderline intelligence but never concluded that Plaintiff demonstrated an inability to cope with the challenges of ordinary life. (R. at 24, 310-12.) The State Agency psychological consultants, Dr. Beers and Dr. Hudspeth found that Plaintiff had borderline intellectual functioning with mild limitations in daily activities, no limitations in social activities, moderate limitations in concentration and attention, and no episodes of deterioration or decompensation. (R. at 24, 293-306.) Similarly, Dr. French made no diagnosis of mental retardation. (R. at 20, 357-62, 365-71, 372-87.) Additionally, Plaintiff was able to obtain a GED and CNA certificate and hold jobs performing semi-skilled labor as a CNA for various employers. (R. at 26, 28, 423-24.) Likewise, there is evidence that Plaintiff drives, performs household and childcare duties, uses a computer, and sells things on the Internet. (R. at 28.)  As a result, there is no evidence to conclude that Plaintiff suffered from deficits in adaptive functioning marked by an inability to cope with the challenges of ordinary life.

Even on the day of the test, there was significant evidence to conclude that Plaintiff is not mentally retarded.  Plaintiff was rated with full-scale IQ score of 65, verbal score of 72, and a performance score of 65. (R. at 310-12.) Plaintiff was noted to have an adequate attention span and the examiner stated that Plaintiff's IQ scores may be underestimates because Plaintiff "gave up easily" on the questions. (R. at 310-12.) The examiner further noted that Plaintiff had

surprising strength in math, could read very well, and the IQ scores were below her educational, adaptive, and occupational functioning. (R. at 310-12.)

The regulations account for the possibility that an IQ test could be misleading and note that "the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.6(a).  Based upon the regulations, the ALJ properly considered the evidence surrounding the test and concluded the Plaintiff was not mentally retarded.[1]

Finally, from a policy perspective it does not make sense to provide disability benefits on the basis of a test alone. Anyone who takes a test could "give up easily" in order to be deemed disabled. It is far more appropriate for the ALJ, as in this case, to turn to the evidence surrounding the test to reach a more thorough conclusion. As a result, Plaintiff's low test scores do not convince this Court that she should be considered mentally retarded for purposes of obtaining disability benefits.

## 2. Plaintiff's Residual Functioning Capacity.

Plaintiff argues that the ALJ found an erroneous RFC at step four of the five-part test because (1) the ALJ wrongly found that Dr. French's medical opinions are not credible [Doc. 13 at 10], and (2) the Commissioner erred in failing to request a medical source statement from Dr.

---

[1] Plaintiff makes the fall-back argument that the ALJ erred in adopting Dr. Lanier's statements because Dr. Lanier did not consider whether the combined effect of Plaintiff's depression, anxiety, or ADHD may have been the reason why Plaintiff "gave up easily." [Doc. 17. at 6.] However, there is no evidence that Plaintiff's depression, anxiety or ADHD affected her ability to take the test on that day. Furthermore, Dr. Lanier was in the best position to observe Plaintiff on the day of the test and determine whether these impairments impacted the outcome of the test. However, Dr. Lanier made no such conclusion. As such, it would be improper for this Court to speculate on how these impairments affected her ability to take the test on that day in the face of Dr. Lanier's clear conclusions.

Lanier and Dr. House as required by Social Security Regulations [Doc. 13 at 12-13]. This Court finds neither of these arguments convincing for the reasons set forth below.

The ALJ must consider the assessment of Plaintiff's RFC at steps four and five. See 20 C.F.R. § 404.1560(a). RFC is an administrative assessment of what work-related activities an individual can perform despite her limitations. Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001); see also SSR 96-8p, 61 Fed.Reg. 34474, 34475 (1996); 20 C.F.R. § 404.1545(a). The RFC determination must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1). When reviewing an ALJ's findings regarding a claimant's RFC, a district court shall affirm the decision of the ALJ so long as it applied the correct legal standard, and its findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g).

In this case, the ALJ considered Dr. French's opinions but did not give them controlling weight and found that they were not credible.  Specifically, the ALJ noted the lack of corroborating medical evidence for Dr. French's opinions and gave more weight to the actual observations of Dr. House and Dr. Lanier and the actual daily activities performed by Plaintiff. In drawing her conclusions, the ALJ was skeptical of whether Dr. French could even be considered a "treating source." (R. at 27.) However, the ALJ's skepticism is irrelevant because the ALJ inevitably gave the opinions some amount of deference and weighed Dr. French's opinions against the opinions and observations of the other treating doctors. (R. at 26, 27.)

Now, Plaintiff argues that the ALJ erred in finding that Dr. French was not credible and discounting his conclusions by providing arbitrary and speculative reasons to dismiss Dr. French's findings. [Doc. 13 at 10.] In determining a Plaintiff's RFC, the SSA is required to evaluate every medical opinion they receive. 20 C.F.R. § 404.1527(d). A medical opinion is given controlling weight when a treating source's opinion on the issues of the nature and severity

of a plaintiff's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2). When a medical opinion is not given controlling weight, the opinion is still entitled to deference, and the ALJ must determine the weight given to a medical opinion by weighing several factors, such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialty, and other factors. 20 C.F.R. § 404.1527(d)(2)-(6); SSR 96-2p.

Plaintiff insists that under Social Security Ruling ("SSR") 96-2p when medical opinions are not entitled to "controlling weight," they are still entitled to "great weight." [Doc. 13 at 10-11.] However, this interpretation is at odds with a plain reading of 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p. [Doc. 13 at 10-11.] SSR 96-2p states that, "*In many cases*, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p (emphasis added).  The SSR further states that, "…opinions from other acceptable medical sources *may be* entitled to great weight…" in reference to opinions from nontreating sources. Id. (emphasis added). In short, SSR 96-2p does not stand for the proposition that medical opinions which receive less than controlling weight are automatically entitled to "great weight." Instead, as noted, the ALJ must determine the weight to give to the medical opinion by considering factors, such as the length of the treatment relationship and the frequency of examinations, the nature and extent of the treatment relationship, supportability, consistency, specialty, and other factors. See 20 C.F.R. § 404.1527(d)(2)-(6); SSR 96-2p.

Plaintiff also contends that none of the reasons stated by the ALJ for minimizing Dr. French's opinion are "good reasons." [Doc. 13 at 10-11.] An ALJ is obligated to give "good

reasons"[2] for giving a medical opinion less than controlling weight. 20 C.F.R. § 404.1527(d)(2).

In this case, the ALJ found that Dr. French's conclusions regarding Plaintiff's physical

limitations were not credible because Dr. French, as a consulting psychologist rather than a

medical doctor, was not qualified to speak to Plaintiff's physical RFC.[3] (R. at 21, 27.) Next, the

ALJ found Dr. French's other opinions were not deserving of controlling weight because

Plaintiff had only two visits with Dr. French between 2000 and 2003 and two visits in 2005 after

Plaintiff received her Notice of Hearing.[4] (R. at 21, 22.) The ALJ questioned the supportability

of Dr. French's medical opinions by pointing out that Dr. French did not indicate whether he had

any first-hand knowledge of Plaintiff's actual daily activities, instead relying on subjective

answers to subjective questions on various tests to reach his conclusions.[5] (R. at 21, 27.)

Furthermore, the ALJ was critical of Dr. French's conclusions and pointed out that Dr. French

never explained the basis for his conclusion that Plaintiff was disabled. (R. at 27.) In addition,

the ALJ pointed to blatant inconsistencies within Dr. French's conclusions by noting that on one

form Dr. French stated that Plaintiff could not interact with members of the public due to

limitations in her "mental residual functional capacity," then on a later form stated that she is

"unlimited or has [a] good ability to interact with the public."  (R. at 27.)

---

[2] If benefits are denied or a decision is not fully favorable, the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR 96-2p.

[3] See 20 C.F.R. § 404.1527(d)(2)(ii) & (d)(5) (Nature and extent of the treatment relationship and Specialization factors).

[4] See 20 C.F.R. § 404.1527(d)(2)(i) (Length of the treatment relationship and the frequency of examination factor).

[5] See 20 C.F.R. § 404.1527(d)(3) (Supportability factor).

It is evident that the ALJ determined the weight in which Dr. French's opinions were entitled by taking into account some or all of the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6) and that these were good reasons, as required by 20 C.F.R. § 404.1527(d)(2). Therefore, substantial evidence supports the ALJ's decision to give Dr. French's opinions less than controlling weight and less weight than the observations of Dr. House and Dr. Lanier.

Plaintiff's second argument regarding the ALJ's RFC determination focuses on the lack of a medical source statement ("MSS") from Dr. Lanier and Dr. House.  Plaintiff argues that the Commissioner erred in failing to request a MSS from these two doctors, as required by the regulations.  [Doc. 13 at 12-13.] Plaintiff argues that it was harmful error for the ALJ to instead rely on statements from non-examining state agency certified examiners, Dr. Beers and Dr. Hudspeth. [Doc. 13 at 13.] According to Plaintiff, had the ALJ properly obtained a MSS from Dr. Lanier and Dr. House, the hypotheticals presented to the VE would have been vastly different and likely resulted in a determination that there were no jobs Plaintiff could perform. [Doc. 13 at 14.]

A MSS is a medical opinion submitted by an acceptable medical source, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment. SSR 96-5p. An MSS will often focus on a particular individual's physical or mental abilities to perform work-related activities for a sustained basis. Id. The ALJ is generally expected to request that acceptable medical sources provide these statements with their medical reports. Id.

However, the regulations specifically state that "although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete."  20 C.F.R. § 416.913(b)(6).  Based upon

our Appellate Court's precedence, an ALJ is only required to request an MSS when the

information already in the record is inadequate to make a determination of disability.  Skinner v.

Astrue, 478 F.3d 836, 843 (7th Cir. 2007).  In this case, despite the absence of MSS, the ALJ

considered the medical opinions and observations of Dr. Lanier and Dr. House in reaching his

RFC determination in addition to the opinions and observations of Dr. Slater, Dr. French, Dr.

Beers, Dr. Hudspeth and other medical sources in the record. The record demonstrates that the

ALJ gave the opinions and observations of Dr. Lanier and Dr. House a substantial amount of

deference in determining Plaintiff's RFC. (R. at 20, 23, 24, 25, 26, 27.) As such, the failure to

request a MSS from Dr. House and Dr. Lanier did not constitute harmful error because the

record before the ALJ still allowed her to make a rational basis for determining disability.

Therefore, the ALJ's RFC determination is supported by substantial evidence.

### 3. Plaintiff's Creditability.

Plaintiff argues that the ALJ incorrectly found that Plaintiff was not credible. [Doc. 13 at

16.] An ALJ's credibility determination is given special deference and will not be reversed

unless it is patently wrong. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000); Herr v. Sullivan,

912 F.2d 178, 181 (7th Cir. 1990); Kelley, 890 F.2d at 965. Credibility findings are reserved for

the ALJ, in part because the ALJ is able to observe the witness. Id. at 964.

In this case, the ALJ's creditability determination was not patently wrong. The ALJ

found that Plaintiff had impairments which cause work-related limitations, but the ALJ

disregarded Plaintiff's allegations regarding the degree of her limitations because the ALJ

concluded the allegations were not credible. (R. at 21, 30.) The ALJ identified several reasons

why Plaintiff's allegations were less than credible. Plaintiff's lengthy allegations regarding her

disabilities seemed to conflict with the actual medical evidence in the record such as the

observations and conclusions of Dr. House, Dr. Lanier, and Dr. Slater, as well as additional

evidence discussed supra, Part IV. 1. Therefore, the ALJ gave more weight to the medical

evidence than Plaintiff's subjective statements concerning the severity of her impairments. (R. at

23-24, 25.) The ALJ further observed Plaintiff's demeanor at the hearing and doubted the

veracity of her statements. (R. at 25.) The ALJ looked at the letters and statements submitted by

Plaintiff's family and found that the tasks that family members regularly helped Plaintiff with

were not unusual of a young mother receiving intermitted help with child care. (R. at 25.) The

ALJ also found that the letters did not demonstrate that Plaintiff had deficits in mental

functioning to the degree she alleged, and the letters did not support Plaintiff's testimony that

she is almost never alone with her children or that she is unable to independently care for her

children. (R. at 25.)

        This Court agrees that the medical evidence in the record does not support Plaintiff's

testimony regarding the severity of her impairments, and there is certainly not enough evidence

to convince this Court that the ALJ's creditability determination was patently wrong. Thus, the

ALJ's finding regarding Plaintiff's creditability will not be disturbed by this Court.

### 4. Step Five Determination.[6]

[6] The parties also argue about the ALJ's determination at step four. However, this dispute is not
relevant to the outcome of the case. The ALJ ruled at step four, with some hesitation, that
Plaintiff was capable of performing her past work as a line worker. There is a dispute over which
of Plaintiff's previous jobs should be considered Plaintiff's "former occupation" for purposes of
a step four analysis. Plaintiff argues that her past work as a CNA was the only work which she
performed at a substantially gainful level and her work as a line worker was never performed at
an adequate level to be considered her "former occupation." Plaintiff worked for four months as
a line worker which was long enough for this job to be considered a substantially gainful activity
("SGA") and thus relevant for determining a plaintiff's previous employment. See 20 C.F.R. §
404.1574(c)(3). However, it is evident that Plaintiff had a checkered work history at this job,
which could indicate that this occupation was not performed at a SGA level. See 20 C.F.R. §
404.1574(c)(4). Nevertheless, the ALJ went on to determine that the SSA met its burden at step
five, and Plaintiff could perform several other jobs which are available in the national economy.
Because this Court agrees with the ALJ's step five analysis, it is not necessary to delve into this
squabble at step four over which of Plaintiff's jobs should be considered her former occupation.

Plaintiff argues that the ALJ erred at step five because (1) the hypotheticals posed to the VE did not consider the combined effect of all substantial physical and mental impairments [Doc 17 at 13,] and (2) the VE's testimony was not reliable because he was not able to verify his testimony with specific data. Neither of these arguments persuades the Court that the ALJ erred at step five.

At step five, the ALJ must decide whether a plaintiff is able to perform any other work within the national economy. See 20 C.F.R. § 404.1520(g). At this step, the burden is on the SSA to show that there are significant numbers of jobs in the national economy that a plaintiff can perform consistent with his or her age, education, past work experience, and functional capacity. See id. In making this determination, an ALJ is entitled to rely primarily on the testimony of a VE in order to satisfy the SSA's burden. See Kelley, 890 F.2d at 965.

In the case at bar, the VE was asked whether a person with Plaintiff's limitations could hypothetically perform jobs available in the national economy. (R. at 457.) The VE stated that there were indeed a wide variety of jobs in the national economy that Plaintiff was capable of performing. (R. at 457-58). The VE stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. at 461.)

First, Plaintiff argues that the VE's testimony was unreliable because the hypotheticals presented to the VE did not consider the combined effect of all of her physical and mental impairments. [Doc. 17 at 13.] Plaintiff also contends that the hypothetical submitted to the VE should have included additional limitations, such as inability to perform comparative analysis and follow detailed instructions. [Doc. 13 at 25.] However, record demonstrates that the ALJ went out of his way to mention that her RFC determination considered the combined effects of all of Plaintiff's impairments. (R. at 18, 22, 30.) In addition, this Court has already determined

that the ALJ's RFC determination is supported by substantial evidence. Supra, Part IV.2. Plaintiff's vocational profile was based on the ALJ's RFC determination and was submitted to the VE in the hypothetical. (R. at 29, 457.) Therefore, this Court finds that the VE did consider the combined effect of all of Plaintiff's substantial physical and mental impairments, and substantial evidence supports the ALJ's decision to rely primarily on the VE's response to the hypothetical.

Second, Plaintiff argues that because the VE was not able to verify his testimony with specific data when requested by Plaintiff, the ALJ erred in finding the VE's testimony reliable. [Doc. 17 at 13.] Plaintiff relies on McKinnie v. Barnhart, 368 F.3d 907, 911 (7th Cir. 2004)(citing Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)), for the proposition that a VE is free to give a bottom line, but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the vocational expert's opinions. In McKinnie, the VE did not substantiate her findings with a written report or other documentation, and her vague responses were insufficient to establish a foundation for her testimony. Id. Furthermore, the ALJ did not inquire into the reliability of her conclusions as she was required to do. Id. As a result, the Court held that "if the basis of the vocational expert's conclusions is questioned at the hearing ... then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable." Id.

In the case at bar, Plaintiff argues that harmful error resulted from the VE's inability to provide DOT numbers.[7] At the hearing, Plaintiff's counsel inquired on cross-examination about the fifteen or so specific jobs which Plaintiff could perform and began to inquire about the number of jobs available for each of these specific occupational titles.  In response, the VE

---

[7] A DOT number is a number that identifies a particular job title in the Dictionary of Occupational Titles.

specifically said, "Yeah, I can give you all those DOT numbers." Plaintiff's counsel then failed to follow up and asked for the numbers. (R. at 461-63.) As a result, there is no evidence that the VE was unwilling or unable to provide the relevant DOT numbers and there appears to be no factual basis for Plaintiff's argument.

Furthermore, the record in this case presents a dramatically different scenario than the McKinnie case. Specifically, the ALJ did inquire into the reliability of the VE's testimony and the VE did provide the necessary data to substantiate his conclusions when requested by the ALJ. (R. at 30, 459.) The ALJ is entitled to rely on the uncontradicted testimony of the VE in reaching her step five determination.[8] See Kelley, 890 F.2d at 965.

Accordingly, this Court finds that the ALJ's findings were supported by substantial evidence at step five and based on the record before the Court, Plaintiff is not disabled under the Social Security Act.

**V.**
**CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment is DENIED [Doc. 12], and Defendant's Motion for Summary Affirmance is GRANTED [Doc. 15.] The decision of the ALJ is hereby AFFIRMED.

---

[8] Plaintiff also disagrees with the substance of the VE's testimony. [Doc. 23-25.] However, Plaintiff never contradicted the VE's testimony with additional expert testimony and did not succeed in discrediting the VE's testimony at the hearing. As a result, the ALJ did not err when she found the VE's testimony to be credible. (R. at 32-33.)

CASE TERMINATED.


ENTERED this  31st  day of March, 2008.


                              s/Joe B. McDade
                              Joe Billy McDade
                              United States District Judge